HARVEY C. HINES v. NORFOLK SOUTHERN RAILROAD COMPANY.

(Filed 11 October, 1911.)

1. **Railroads—Crossings—"Look and Listen"—Injury After Crossing —Negligence—Contributory Negligence—Nonsuit.**

When the negligence complained of in an action against a railroad company for injuring plaintiff's horse and wagon after he had crossed the railroad track at a public crossing was that by keeping a proper lookout and in the exercise of reasonable care the defendant's engineer could have avoided the injury, the fact that the plaintiff failed to "look and listen" for the approaching train before attempting to cross has no bearing upon the questions of either negligence or contributory negligence.

2. **Railroads—Negligence—Evidence—Contributory Negligence— Nonsuit.**

Under conflicting evidence, when there is a motion by defendant to nonsuit, the evidence will be considered in the view most favorable to plaintiff; and when it appears from the evidence of the latter that the injury complained of was caused by the backing of his horse, which had become frightened at the approaching train, and a consequent injury to the horse and the wagon hitched to him, by a collision with the defendant's slowly moving train, and that by keeping a proper lookout and in the exercise of ordinary care the defendant's engineer could have avoided the injury, the question raised is one for the jury, unless it appears that, as a matter of law, the plaintiff by his own negligence contributed to the injury complained of.

3. **Railroads—Evidence—Contributory Negligence—Continuing Act —Nonsuit.**

When there is evidence that the engineer on defendant's train was negligent in not keeping a proper lookout or in the exercise

of ordinary care, in consequence of which the plaintiff's horse backed the wagon to which it was hitched upon defendant's slowly moving train, to plaintiff's damage, it would bar the plaintiff's right to recover if shown that, after the horse began to back, the driver was negligent, and this negligence continued to the time of the injury, under the surrounding circumstances and conditions.

APPEAL by plaintiff from *Peebles, J.,* at March Term, 1911, of LENOIR.

This action is to recover damages for injury to the horse and wagon of the plaintiff.

The plaintiff alleges that the injury occurred on 16 December, 1909, and was caused by the negligence of the defendant, which is denied.

The wagon was loaded with apples, and the injury occurred about 8 o'clock A. M., at the first crossing after leaving the depot at Kinston.

There is evidence that the driver did not look and listen before entering upon the track, and that he saw the train of the defendant as he reached the track.

It is admitted that the horse and wagon crossed the track of the defendant in safety, and had reached a point twenty-five or twenty-eight yards beyond the track, at the time the train of defendant, about seventy-five yards distant, was approaching the crossing. The horse then began backing, and, according to the evidence of the plaintiff, did not stop until the wagon collided with the engine.

There is some evidence of obstructions to the view near the track, but there is also evidence that the horse was in full view of the engine, and the engineer admitted that he saw the horse backing when he was within forty or fifty feet of the crossing. There is also evidence that the train was running about four or five miles an hour, and could have been stopped in eight feet, and that the engineer called to the driver of the wagon and told him to stop backing his horse into the train.

The driver gives the following account of the occurrence:

Q. What took place when you came to the track? A. I done crossed the track; the train bell was ringing and my horse

looked up like he saw it, and stopped, and he commenced to back back; when he commenced to back back I commenced tapping him to keep him from backing. I saw he was going to stop, and I jumped off and ran to his head, so as to pull him around the corner. He kept backing. I ran to the end of the dray. When I got to the back the train was very near. I slid out from behind the cart and the train struck the back end of the dray and knocked the horse down. The front part of the bumper struck the cart; the back end of the dray was struck by the cow-catcher.

(It is admitted that the street crossing Gordon is Independence Street.)

Q. When you crossed the track going this way, did you see the train? A. Yes, sir; it was further down, about seventy-five steps—yards—something like that—from the street I was crossing.

Q. When your horse stopped and was looking at the train, can you estimate how fast the train was going? A. About four or five miles an hour.

Q. When the train was coming towards you, did you see anybody looking out of the windows of the train? A. There was a whole lot looking out. The engineer called to me and said stop backing my horse in the train.

Q. Where was he—how far was the engineer when he was talking to you about not backing your horse? A. About fifteen or twenty steps from me.

Q. How long have you been driving a horse? A. I have been tending to him for about a year. I have been accustomed to horses for about fifteen or twenty years.

Q. What damage was done to the wagon after the mix-up? A. The right wheel was torn to pieces, the right wheel and shafts.

Q. What injury did the horse receive? A. The right foot— I think it was the right one—broke in two. They had to kill him. He was smashed up.

Q. What else was done besides breaking his leg? A. Just smashed him right down.

The defendant offered evidence to the contrary, and the engineer testified as follows:

Q. Were you the engineer on the train at that time? A. Yes, sir.

Q. How long have you been in the service of the company? A. On this road eleven years.

Q. State what you saw? A. I noticed when I approached this crossing—I was about as far from here to the door, the length of this building—this driver was sitting up in front of his cart when I noticed him; by my noticing him, the horse was backing; the driver jumped off; the horse was backing; that put him in this direction (indicating); the lines were over the hames; the horse kept rearing; I began to slow up; the horse backed up more, less than the width of this stand, and stopped. I ran the engine, and when I was going by, the horse reared up; that brought him by the engine, and the crank-pin on the driver struck the cart and threw the horse under the tender and broke his leg and bruised him up.

Q. You say you were the length of this building when you first saw him? A. I might have been more.

Q. How close were you when you first saw him? A. If he had kept on he would have gone by; the horse stopped about ten feet of the engine. I released her and let her go by.

Q. How far did you run after you struck the cart? A. I judge about eight feet; it didn't make a revolution; the crank-pin came just near enough to slew the horse around; it struck the right wheel of the cart. The driver was on the opposite side of me.

Q. William Hadley said you hollered to him? A. No, sir; I never said a word to him until I stopped. The horse was down. I said, "Why did you want to back the horse in the train?"

Q. When the horse began to back the last time, could you have stopped the train to prevent him from backing the cart into the train? A. No, sir; it was so quick. He stood so a little time. I guess I moved the length of this room before he

156—15

moved the second time—enough for me to go by him. Instead of the horse going forward, the driver had the reins on him; he backed back.

Q. What part of the engine struck the horse? A. The front driver struck the cart; that is, middle of the engine.

Upon the conclusion of the evidence, his Honor granted the motion of the defendant for judgment of nonsuit, and the plaintiff excepted and appealed.

*Loftin & Dawson for plaintiff.*
*Rouse & Land for defendant.*

ALLEN, J. The right of the plaintiff to maintain this action must be determined by the conduct of the parties after the time the horse began to back, and if the evidence presents a phase from which the jury could find that the engineer, by keeping a lookout, could by the exercise of ordinary care have seen that a collision was imminent, in time to stop his train and avoid it, then it was his duty to do so; and if the jury should so find, the plaintiff could recover, notwithstanding the failure of the driver to look and listen at the crossing.

This is clearly stated by *Justice Hoke* in *Snipes v. Manufacturing Co.,* 152 N. C., 46.

After discussing the duty of the engineer to keep a lookout, and to stop and avoid injury when he can do so by the exercise of ordinary care, he says: "Ordinarily, cases calling for application of the doctrine indicated arise when the injured person was down on the track, apparently unconscious or helpless, but such extreme conditions are not at all essential, and the ruling should prevail whenever an engineer operating a railroad train does or, in proper performance of his duty, should observe that a collision is not improbable, and that a person is in such a position of peril that ordinary effort on his part will not likely avail to save him from injury; and the authorities are also to the effect that an engineer in such circumstances should resolve doubts in favor of the safer course."

The quotation speaks in terms of persons, but the principle also applies to injury to property.

Under this rule, what is the evidence, and what facts could the jury find from it, giving it a construction most favorable to the plaintiff, which we must do on a motion for nonsuit?

The evidence of the plaintiff, if believed, shows that the horse was twenty-five or twenty-eight steps beyond the crossing when he began to back; that he was backing towards the track; that he continued to back without stopping until there was a collision between the wagon and the train; that the driver was trying to stop the horse and could not do so; that the horse and wagon and driver were in full view of the engineer; that the engineer called to the driver and told him to stop backing into the train, when about fifteen or twenty yards from him; that at the time the horse began to back the engine was seventy-five yards from the crossing, and that it could have been stopped in eight feet.

If so, there was evidence that the engineer could, by the exercise of ordinary care, have seen that a collision was imminent, in time to stop the engine and avoid the injury.

There was evidence on the part of the defendant which, if accepted by the jury, would exonerate it.

The engineer testified that he saw the horse backing, and reduced the speed of his engine; that when near the horse and wagon, the horse stopped and appeared to be under control; that he then increased his speed, and as he was passing the crossing the horse suddenly reared and backed into the train.

If the jury should find this evidence to be true, the defendant would not be liable.

The case of *Kearns v. R. R.,* 139 N. C., 471, is not in conflict with these views. In that case the train had passed the crossing, when the horse began to back, and there was no evidence, in the opinion of the Court, of anything the engineer could have done to avoid the injury.

There is some evidence of negligence on the part of the driver, in charge of the horse and wagon, at the time of the injury, but it is not of such character that we can declare, as matter of law, that it amounts to contributory negligence.

It was his duty to look and listen as he approached the crossing, and ordinarily a failure to do so will bar a recovery for an

injury on the crossing; but in this case the crossing was passed in safety, and there is no causal connection between this failure of duty and the injury. If after the horse began to back, the driver was negligent and this negligence continued to the time of the injury and contributed to it, the plaintiff could not recover, but in passing upon this question the jury would have the right to consider his surroundings, and the law would require no more of him than to act as a man of ordinary prudence would have done under similar circumstances.

The question is not what a prudent man would do now in the light of subsequent events, but what would a man of ordinary prudence have done in the situation in which the driver was placed.

In our opinion, there was some evidence for the consideration of the jury, and a new trial is ordered.

New trial.